UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| RICHARD WILMER GRUBER, | Civil No.        1:08-0524-JLS (PCL) |
| Petitioner, | |
| | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| JAMES TILTON, et al., | |
| Respondents. | |

**I.      INTRODUCTION AND PROCEDURAL BACKGROUND**

Richard Wilmer Gruber (hereinafter "Gruber"), a state prisoner represented by counsel in this matter, filed a Petition for Writ of Habeas Corpus in the Eastern District of California (Fresno Division) on April 17, 2008 [doc. no. 1].  On November 25, 2008, the Petition was reassigned to visiting District Judge Janis L. Sammartino for all further proceedings [doc. no. 19] and, on December 18, 2008, the Petition was assigned to visiting Magistrate Judge Peter Lewis for all non-dispositive motions and matters and for such dispositive motions and matters as assigned [doc no. 20].

On November 30, 2004, Gruber was convicted by jury of six (6) counts of procuring or offering a false or forged instrument for recordation in a public office in violation of California Penal Code (hereafter "Penal Code") section 115(a) (counts 6-11 of the First Amended Felony

1   Complaint filed against Gruber and his co-defendant Gordon Stuart Labelle) and two (2) counts of

2   conspiracy to defraud another of property in violation of Penal Code section 182(a)(4) (counts 12

3   & 13 of the First Amended Felony Complaint).  (Resp't Lod. Nos. 1-3, Clerk's Transcript on

4   Appeal (hereafter "CT") at 2 CT 516-27; *see* 1 CT 10-15.)  On January 14, 2005, Gruber was

5   sentenced to a three-year term in state prison.  (3 CT 710-12.)

6           Gruber appealed his conviction.  On September 22, 2006, the California Court of Appeal,

7   Fifth Appellate District, partially affirmed the judgment, but reversed the convictions on the

8   conspiracy counts (counts 12 & 13).  (*See* Resp't Lod. No. 5, unpublished opinion filed September

9   22, 2006 in the Fifth District Court of Appeal, Case No. F047525 at 22-27.)  Gruber's three-year

10  sentence was unaffected because the sentences on the conspiracy counts were stayed by the trial

11  court at the time of sentencing.  (3 CT 10-12.)  Gruber then filed a petition for review in the

12  California Supreme Court, which that court denied on January 17, 2007.  (Resp't Lod. Nos. 6 & 7.)

13  On September 28, 2007, Gruber filed a petition for writ of habeas corpus in the Tulare County

14  Superior Court, which that court denied on October 11, 2007.  (Resp't Lod. Nos. 8 & 9.)

15          Gruber filed the Petition in this case on April 14, 2008 and a brief in support of the petition

16  (hereafter "Petitioner's Brief") on April 18, 2008  [doc. nos. 1 & 5].  Gruber claims, generally,

17  that: (1) constitutionally  insufficient evidence was presented that Gruber "knew" the Uniform

18  Commercial Code financial statements (hereafter "UCC-1s") were "false" or "forged" to support a

19  conviction under Penal Code section 115(a); (2) constitutionally insufficient evidence was

20  presented that the UCC-1s themselves were "false" or "forged" to support a conviction under

21  Penal Code section 115(a); (3) his conviction is invalid because the UCC-1s were not

22  "instruments" according to California law; and (4) his conviction is invalid because the California

23  Court of Appeal used a novel definition of the term "instruments" that was contrary to state legal

24  precedent.  (*See* Petition at 5-6; Petitioner's Brief at 20-47.)  Respondent filed an Answer and

25  accompanying Memorandum of Points and Authorities on August 26, 2008 [doc. no. 13].  Gruber

26  filed a Traverse on October 6, 2008 [doc. no. 18].  The Court has now considered the Petition,

27  Answer, Traverse, and all the supporting documents submitted by the parties.  Based upon the

28  documents and evidence presented in this case, and for the reasons set forth below, the Court

1:08cv0524

1    **DENIES** the Petition.

2    II.    **FACTUAL BACKGROUND**

3           This Court gives deference to state court findings of fact and presumes them to be correct.

4    *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

5    of historical fact, including inferences properly drawn from these facts, are entitled to statutory

6    presumption of correctness).   The relevant facts as found by the state appellate court are as

7    follows:

8                          *The May 1999 Incident*

9           [¶] In May 1999, California Highway Patrol Officer Jean Edmonds stopped a white
     Suburban driven by Gruber's son, Dale Gruber, because the vehicle did not have
10   any California registration or identifiable license plate.  Dale Gruber could not
     produce a valid registration or proof of insurance.  Gruber was in the vehicle and
11   told his son he did not have to provide identification. Officer Edmonds took Dale
     Gruber to jail while a tow truck was called.
12
13          [¶] The vehicle was towed by Crane's Towing, a business owned by Randy
     Bachhofer.  The vehicle did not have a license plate.  In the place where the license
14   plate should have been was a white piece of paper that said "First House of
     Delegates, Tulare County, California."  Gruber later came into Crane's Towing and
15   asked for the vehicle.  Rene O'Neal, who worked at the business, told him he would
     have to obtain a release from the police department.  According to O'Neal, Gruber
16   told her "that we would pay."

17          [¶] Sometime after this incident, Officer Edmonds was served at home with a
     subpoena to appear at a "so-called court" in Tulare County on threat of being sued
18   for $1,000,000.  Officer Edmonds drove by the address of the purported court,
     which was a house with a walnut field around it.  Officer Edmonds took the
19   subpoena to her office's legal department, which advised her to ignore the
     document as neither the court nor the document was valid.

20          [¶] O'Neal was also served with a summons to appear at a court.  Not having heard
     of the court, O'Neal drove by its location and found what appeared to be a home
21   having a yard sale.  [FN4]  She put the summons on Bachhofer's desk.  Bachhofer
     took copies of the summons to his attorney, Richard Barron, who is a partner in the
22   law firm Luke & Barron.  Barron advised Bachhofer to disregard the papers
     because they were bogus documents.  Two or three months after receiving the
23   summons, Crane's Towing received another group of papers that included a "Notice
     and Demand," an "Order for Entry of Default" with the stamp of a "13th Judicial
24   District" on it, and an "Abstract of Judgment" in the amount of $800,000. [FN5]

25          [Footnote 4:] The home was the same one by which Officer
            Edmonds had driven.
26
            [Footnote 5:] The "Notice and Demand," dated July 20, 1999, is
27          addressed to "Van Beurden Insurance Services" and signed by
            Gruber.  The notice states that "Van Beurden" is the agent for
28          Bachhofer, an $800,000 judgment was entered against Bachhofer,

                                        3

and Gruber "demands execution of said judgment to be paid to him within thirty days as set forth by the court order." The "Order for Entry of Default" contains a caption similar to one on a court pleading, which states "Richard Wilmer, Gruber [¶] against [¶] Randy Bachhofer[,]" and lists case number 990629-02. The order states the court finds Bachhofer was served with summons and had not appeared, therefore default was ordered to be entered on the record and "by the court[']s own motion that defendant is ordered to pay damages within thirty day[s] of the date of this order . . . ." The order is dated July 15, 1999, and signed by "Kenneth Richard [¶] Judge." The "Abstract of Judgment[,]" dated July 20, 1999, states the judgment creditor, Gruber, applies for an abstract of judgment and lists the judgment debtor as Bachhofer. Gruber signed the abstract, as did "Christopher James" as clerk, who certified that an $800,000 judgment was entered on July 15, 1999. These documents were mailed to Van Beurden Insurance Services in 1999. An insurance broker with Van Beurden faxed a copy of the documents to Bachhofer and asked what he wanted him to do with them. The insurance company did not pay the claim because Bachhofer's insurance only covered claims involving vehicles that are damaged while being towed.

*The March 2000 Incident*

[¶] On March 6, 2000, Visalia Police Officer Roy Dunn stopped Gruber because his vehicle had a homemade license plate. When Officer Dunn asked for a driver's license, registration and insurance, Gruber presented two handmade documents which he claimed were a vehicle registration and an authorization to operate a vehicle. Officer Dunn cited Gruber for driving without a valid license and failure to register the vehicle or have insurance. He also impounded the vehicle and called Crane's Towing. When Bachhofer pulled up, Gruber told Officer Dunn he already had some type of legal action against Crane's Towing from an earlier incident. After the vehicle was towed, Gruber appeared at Crane's Towing and demanded the return of his vehicle. O'Neal told Gruber he would have to obtain a release from the police station. Gruber responded there was no law and the vehicle had plates. O'Neal went to look at the plate and saw it was similar to the one on the vehicle that was towed in 1999.

[¶] After this incident, Officer Dunn received documents in the mail addressed to him at the Visalia Police Department. The documents stated they were filed on Gruber's behalf and that Dunn was being sued or had been found at fault in some civil action in the amount of $250,000 in gold dollars, lawful money, and $6,000,000 lawful money of the United States of North America. Officer Dunn turned the documents over to the city attorney, who determined they were not legal, official documents.

*The Sale of Crane's Towing and Bachhofer's Lawsuit against Gruber and Labelle*

[¶] Bachhofer decided to sell his business in 2000. By February 2003, he had entered into escrow with a buyer. On February 2, 2003, Gordon Labelle, Gruber's co-defendant, delivered papers to the escrow company and Bachhofer's office comprised of a UCC-1 financing statement, "Abstract of Judgment" showing an $800,000 judgment entered in case number 990629-02, a "Claim[,]" and a certificate of service signed by LaBelle. The UCC-1, which is numbered

4

0303160513 and has a file stamp of January 30, 2003, lists Bachhofer as the debtor, Gruber as the secured party, and "Judgment for $800,000.00 case # 990629-2" as the collateral. The "Claim" is signed by Gruber and addressed to Bachhofer as "Customer." The document states "[i]t has come to [m]y attention that, by reason of Public Legal Notice, you are transferring certain private property to which a claim may be made under UCC. Therefore I make this claim. [¶] Description of claim: Judgment dated fifteenth day of the seventh month A.D.1999 case # 990629-02, [i]n the amount of 800,000.00 in lawful dollars of the United States of America."

[¶] Even though none of the papers was valid, Bachhofer was only able to complete the sale after a delay of several months and the expenditure of several thousand dollars in attorney fees. For over a year, Bachhofer had no access to most of the sale proceeds. The escrow company tried to get Gruber to sign a release of the lien, but he declined to do so. Eventually, Barron filed a lawsuit on Bachhofer's behalf against Gruber, Labelle, Christopher James and Kenneth Richard that resulted in Bachhofer obtaining a judgment that declared the financing statement void. [FN6]

[Footnote 6:] Gruber has requested in his opening brief that we take judicial notice of the entire court file of Bachhofer's lawsuit against himself and Labelle, which was lodged as an exhibit in the trial court. Labelle's attorney objected to the introduction of the exhibit into evidence, to which the prosecutor responded he did not intend to introduce the entire file into evidence. Consequently, the exhibit was never received into evidence. Gruber contends the file is relevant because if we were to examine it we would discover that the judgment, which was obtained by default, is void because no proof of service was filed showing service of the complaint on Gruber. We note that Gruber appealed from the judgment in that case, and this court affirmed the judgment in *Bachhofer v. Gruber* (June 30, 2005, F045383) [nonpub. opn.].

[¶] Of course we may "take judicial notice" (Evid.Code, § 459, subd. (a)) of the "[r]ecords of ... any court of this state" ( id., § 452, subd. (d)). We fail to see-and certainly, Gruber fails to show-the relevance of the subject record. Neither the court nor the jury made any determination in light thereof. Moreover, although the judgment was originally marked as an exhibit, it was not received into evidence. "Because ... no evidence is admissible except relevant evidence, it is reasonable to hold that judicial notice, which is a substitute for formal proof of a matter by evidence, cannot be taken of any matter that is irrelevant...." (12 Jefferson, Cal.Evidence Benchbook (2d ed. 1982) Judicial Notice, § 47.1, p. 1749.) (See *People v. Rowland* (1992) 4 Cal.4th 238, 268.) Consequently, we deny the request.

[¶] Sometime early in 2004, Barron became aware of two UCC filings against his firm, with Gruber and Labelle as creditors. Four other UCC filings showed Barron as the debtor and either Labelle or Gruber as creditors. Neither Barron nor his law firm owed any money to either person. Barron's partner, Linda Luke, became aware of UCC financing statements filed against her and the law firm when an investigator showed them to Barron approximately six months before trial. Two of the financing statements showed Luke as being personally indebted to Gruber and Labelle, even though she in fact owed no such debts. Luke was not involved in the 2003 lawsuit Barron filed against Gruber and Labelle, other than the presence of the

law firm's name on the pleadings.  She never met Labelle or Gruber, and neither she nor her law firm were indebted to them.

[¶] LaRayne Cleek, the Tulare County court executive officer, jury commissioner and clerk, first learned of a UCC-1 naming her as the debtor and Labelle as the creditor in June 2003, when Cynthia Logan, the deputy court executive for the Tulare Superior Court, showed it to her.  Cleek did not owe any money to Labelle, did not know Labelle, had never met him, and knew nothing of a lawsuit involving Labelle or Gruber.  Cleek was not involved in the day-to-day running of the individual offices and would not have knowledge of individual proceedings.  Cleek also would not know about particular papers filed in the clerk's office and would not be able to manipulate what happened there.  Cleek's name is on the stamp for official papers and documents filed in the clerk's office.  Normally a deputy clerk accepts and signs the documents.  Clerks have nothing to do with determining the legality of documents filed and do not give legal advice.  Clerks do not have the power to change a document that is filed; one who tried to do so would face disciplinary action.

[¶] Logan became aware of the lawsuit Bachhofer filed against Gruber and Labelle when some paperwork was dropped off at the clerk's office without any case number or other indication of the case to which it belonged.  By looking at names, she determined to which case the paperwork belonged, but could not determine what the paperwork was intended to do, so it was simply stamped received and lodged in the file.  Part of the paperwork included two documents that contained a copy of a summons published in a newspaper notifying Gruber and Labelle of Bachhofer's lawsuit against them, over which was handwritten in red ink nearly identical messages.  One of the documents was signed by Gruber while the other was signed by Labelle.  The documents stated "[y]our offer of contract for subject matter jurisdiction is hereby rejected and returned to you unsigned in full accord with truth in lending[,]" ordered them "to prove up the claim or cease and desist[,]" that further correspondence must be signed under penalty of perjury, and "[i]f you or your agents/heirs/assigns are representing me ... you are hereby fired!"

*The Investigation*

[¶] Craig McDonald, an investigator for the Tulare County District Attorney's Office, investigated Gruber because of the lien placed against Crane's Towing.  McDonald spoke to Gruber at his home.  Gruber told McDonald he was stopped for having an unregistered vehicle, even though his vehicle was registered because he had a "brand" on file with the state.  Gruber said he went to the towing company to get the vehicle.  When the company would not release the vehicle, he filed a lawsuit in the 13th Judicial District Court.  Because Bachhofer, the company's owner, did not appear at the hearing, an $800,000 judgment was entered against him.  Gruber did not justify the amount of the judgment.  Gruber told McDonald he filed a UCC-1 against Bachhofer.  Gruber refused to say whether he knew Labelle.  Gruber explained that California's 1849 constitution was still valid since, although there was a second constitution in 1869, it did not state that any part of the prior constitution was invalid.

[¶] Eric Grant, an investigator with the Tulare County District Attorney's Office, contacted Labelle on July 19, 2004.  Grant asked for Labelle's driver's license.  Labelle refused to give him one, explaining if he signed a contract to get a driver's license, he would be in a franchise with the State of California.  Labelle admitted having filed a UCC-1 against Cleek.  Labelle told Grant that Cleek tried to get him to serve on jury duty even though he had a doctor's note and had helped Barron file some documents in the case against him.  Labelle stated that if the information he had found out was shown in federal court, Cleek would be terminated, sent to jail

and never hold office again.  Labelle thought Cleek was manipulating court files by not giving documents over to the judges even though she had a duty to do so.  Labelle had gone to the courthouse several times to look at his file, only to be told it was unavailable because it was on Cleek's desk.  He had never actually talked to Cleek and did not know who she was.

[¶] Labelle published a copyright notice on his name in the Thrifty Nickel so that anyone who used his name would owe him $500,000 for each use.  Labelle figured Cleek owed him $2,000,000 because the newspaper summons with his name was published four times.  Labelle filed the UCC-1 financing statement because he called the UCC office and was told that was the way to secure a debt.  Labelle explained Cleek's debt was based on the copyright violations and her being the person behind the lawsuit against him.  If it was brought to his attention that there was a problem with the UCC filing or the law said he could not file a UCC, he would gladly apologize and remove the document.  Labelle told Grant if anyone owed you money, you could file a UCC-1 to secure the debt and then send them a bill.  Labelle said he hadn't bothered to bill Cleek, but he could if she wanted him to.

[¶] Labelle told Grant he had known Gruber for a long time and Gruber was a good, honest man.  Labelle admitted delivering a number of documents for Gruber.

*The Financing Statements*

[¶] Kathleen Vasquez manages the Uniform Commercial Code Section of the business programs division of the Secretary of State's office in Sacramento, which handles the filing requirements for UCC-1 financing statements (UCC-1).  Vasquez explained a financing statement is a simple document that lists a debtor and a secured party, and describes the collateral.  The document serves as a notice that goes in the public record for interested third parties that a particular person has a debt secured by collateral that is not real estate.  So long as a financing statement is filled out properly with the information contained in the Uniform Commercial Code, which includes the debtor and secured party fields, and the filing fee is paid, the Secretary of State is mandated to accept and file it.

[¶] There is no procedure for revoking or removing a UCC-1.  The form stays filed over its life, typically five years, and Vasquez's office retains it for an additional year after that.  A UCC-1 can be continued in a six-month window prior to its expiration date.  A person can file a termination statement stating a lien has been terminated, but the original UCC-1 is still retained on record.  A UCC-3 is an amendment document that can be used to continue the lien for an additional five years, to file a termination statement, to file an assignment, or to file a change in collateral.  A UCC-5 is a correction statement filed by a person who believes the record is either in error or false.

[¶] Vasquez verified that six UCC filings had been filed in her office which listed Gruber as the secured party and Bachhofer, Barron, Luke & Barron, and Luke as debtors.  [FN7]  She also verified five other UCC-1s listing Labelle as the secured party and Cleek, Barron, Luke, and Luke & Barron as debtors.  Vasquez confirmed her office is a government office and the UCC-1s are government documents.

[Footnote 7:] The documents which Gruber filed and which listed Gruber as creditor are: (1) a UCC-1 numbered 0303160513, filed January 30, 2003, listing Bachhofer as debtor and the judgment in case # 990629-2 as collateral; (2) a UCC Financing Statement Amendment numbered 03316C0404, filed November 6, 2003, which

restated the collateral on UCC-1 number 0303160513 as the property description of three parcels; (3) a UCC-1 numbered 0331660890, filed November 6, 2003, listing Barron as debtor and "Notice of Apparent Liability default judgment" for $10,000, as collateral; (4) a UCC-1 numbered 0331660884, filed November 6, 2003, listing Barron as debtor, and "[a]ll of debtor's assets, land, and personal property, and all of debtor's interest in said assets, land, and personal property, now owned and hereafter acquired, now existing and hereafter arising, and wherever located, in the amount of two million United States Dollars ($2,000,000.00); (5) a UCC-1 numbered 0333760939, filed November 25, 2003, listing "Luke & Barron" as debtor and "[a]ll of debtor's assets, land, bonds, and personal property, and all of debtor's interest in said assets, land, and personal property, now owned and hereafter acquired, now existing and hereafter arising, and wherever located[,]" as collateral; and (6) a UCC-1 numbered 0333760936, filed November 25, 2003, listing Luke as debtor and "[a]ll of debtor's assets, land, bonds, and personal property, and all of debtor's interest in said assets, land, and personal property, now owned and hereafter acquired, now existing and hereafter arising, and wherever located[,]" as collateral.

[¶] The trial court took judicial notice, in the jury's presence, that the First House of Delegates, District Court, 13th Judicial District, California was not a court recognized under the laws of the State of California or Tulare County. The trial court also informed the jury that a name cannot be copyrighted.

*Defense Case*

[¶] Gruber did not testify at trial or present any evidence. Labelle testified that he knew Gruber as an acquaintance and they "got in touch" every once in awhile. Labelle never went to political meetings with Gruber, nor did he know of Gruber's association with any political group. Labelle denied being a member of any anarchist group trying to overthrow the government or harass the government with paper. Labelle admitted serving papers for Gruber three or four times, including the papers regarding Crane's Towing, but claimed he did not read the documents or know their contents. When he signed the documents, it was just to certify that he had served them. Gruber did not pay Labelle for serving the documents. Labelle denied being associated with the 13th District Court or participating with Gruber in any action regarding the 13th District Court.

[¶] Labelle became aware his name had come up in a civil lawsuit involving the law firm of Luke & Barron when Gruber called him. Labelle never saw a publication regarding the lawsuit in the newspapers because he did not read them. Labelle contacted the court, which informed him that process servers were not sued. Labelle said someone named Carrie Lawrence pulled the file and could only find Labelle's proof of service. Labelle admitted responding to the lawsuit in the same manner as Gruber, using a copy of Gruber's response as a guide. He prepared the document at home and delivered it to Gruber. The documents were sent to Luke & Barron and the court. Labelle believed this was a legitimate way to respond to the lawsuit. When Labelle was asked why both he and Gruber had prepared documents in red ink, he responded that he had red pens around the house. He denied that he and Gruber prepared the documents together.

[¶] Labelle said he did not seek legal counsel because he could not afford any. Although he called the legal aid office once, it was very difficult to get help.

8

Labelle came to the court several times to review the file of the lawsuit, only to have Carrie Lawrence tell him the file was on Cleek's desk. Labelle claimed he told Lawrence he had a copyright on his name.

[¶] Labelle published his copyright claim on his name in 2000 or 2001. Gruber also had a copyright on his own name. Labelle copied the language in the claim from several sources, including something he saw in the newspaper, from Gruber, and from a book. At that time, he believed he had a legitimate claim to use of his name. Labelle contacted several attorneys, but he could not speak to them because they required a deposit.

[¶] Labelle called the Secretary of State's office three times to determine how to file a UCC-1 form. Labelle was informed that the office did not care about the form's content. Labelle said he told the person he spoke to what he wanted to do and was told there was nothing wrong with that. Labelle claimed before he called the Secretary of State's office, he had hand-delivered notices to Luke & Barron, Barron, Luke and Cleek about his rights to the use of his name, which notified them they would owe him money if they used his name. Labelle never received a response from any of these people. Labelle denied that he was conspiring with Gruber with respect to the UCC forms and stated he was acting on his own. Labelle denied misleading anyone in order to get the form. When asked how he knew about the UCC forms, Labelle testified he had seen one before, but he didn't know where or remember how he obtained the form.

[¶] Labelle prepared and filed UCC-1s against Cleek, Barron and Luke, all of whom he believed had a legitimate debt to him because they used the copyright after getting his notice to cease doing so. Labelle denied consulting Gruber about the filing of the UCC-1s and did not recall informing Gruber he was preparing them. Labelle never tried to enforce these debts. Labelle did not believe the UCC-1s represented fraudulent debts. Until he was sued, he did not know the effect the UCC-1 had on the tow truck driver's efforts to sell his property. There were no UCC-1s filed showing he and Gruber to be joint creditors against anyone.

[¶] Labelle did not remember refusing to identify himself to Grant or talking to Grant about the California Constitution. Labelle had not read either of the state constitutions. Grant never told Labelle the UCCs were incorrect; he first found out they were invalid after charges were filed against him and he hired defense counsel.

[¶] Labelle attempted to correct the UCC-1s that he filed by mailing corrections on October 12, 2004. The Secretary of State received them on October 18, 2004, three days after the preliminary hearing. Labelle claimed he didn't terminate the liens earlier because he didn't know how. The first termination statements (UCC-3s) he filed were returned because he had changed his address and the officer would not accept two changes on the same form, namely the address change and the termination. Labelle sent out corrected forms and, as of trial, had not received back the filed versions.

(Resp't Lod. No. 5 at 2-13.)

## III.   **DISCUSSION**

### A.   **Scope of Review**

Title 28, United States Code, section 2254(a), sets forth the following scope of review for

1:08cv0524

federal habeas corpus claims:

> [¶] The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in ***violation of the Constitution or laws or treaties of the United States.***

28 U.S.C. § 2254(a) (West 2008) (emphasis added).  As amended, 28 U.S.C. section 2254(d) reads:

> [¶] (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was ***adjudicated on the merits*** in State court proceedings unless the adjudication of the claim –
>
> > [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2008) (emphasis added).

"[The Antiterrorism and Effective Death Penalty Act ("AEDPA")] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"  *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007), quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).  To obtain federal habeas relief, Gruber must satisfy either section 2254(d)(1) or section 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets section 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).  The "objectively unreasonable" standard is not met by a showing of error or of an incorrect application (as opposed to an objectively unreasonable application) of the governing federal law. *Andrade,*

1:08cv0524

538 U.S. at 75; *Woodford,* 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 694, 699 (2002) ("it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied [the Supreme Court precedent] incorrectly").  As the Supreme Court explained, this standard is different from the "clear error" standard in that "[t]he gloss of clear error fails to give proper deference to state court by conflating error (even clear error) without unreasonableness." *Andrade,* 538 U.S. at 75.

Where there is no reasoned decision from the state's highest court, this Court "looks through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*

**B.**     **Analysis**

Gruber claims that: (1) he could not constitutionally be convicted of a violation of Penal Code section 115(a) because there was insufficient evidence to establish that he "knew" the UCC-1s were "false" or "forged" ("Ground One"); (2) he could not constitutionally be convicted of a violation of Penal Code section 115(a) because there was insufficient evidence to establish that the UCC-1s were "false" or "forged" at all ("Ground Two");  (3) he could not constitutionally be convicted of a violation of Penal Code section 115(a) since the UCC-1s submitted to the California Secretary of State did not constitute "instruments" within the meaning of Penal Code section 115(a) ("Ground Three"); and (4) he could not constitutionally be convicted of a violation of Penal Code section 115(a) since the affirmance of his conviction by the Fifth District Court of Appeal was based on a novel definition of the term "instrument," which was contrary to California precedent ("Ground Four"). (*See* Petition at 5-6; Petitioner's Brief at 20-47.)  The Court considers the insufficiency of the evidence claims first and the claims pertaining to interpretation of California law second.

**i.**     **Insufficiency of the evidence (Grounds One and Two)**

Gruber contends that he could not constitutionally be convicted of a violation of Penal

1:08cv0524

Code section 115(a) because there was insufficient evidence to establish that he "knew" the UCC-1s were "false" or "forged" and because there was insufficient evidence to establish that the UCC-1s were "false" or "forged" at all.  (Petition at Grounds One and Two; Petitioner's Brief at 20-31.)  Gruber raised these claims as part of his petition for review in the California Supreme Court.  (*See* Resp't Lod. No. 6.)  That petition was denied without reasoned decision or citation of authority.  (Resp't Lod. No. 7.)  The last state court decision to address the merits of this claim is the appellate court's September 22, 2006 opinion denying the claims (Resp't Lod. No. 5), and that is the decision reviewed here.  *Ylst*, 501 U.S. at 801-06.  That court found:

> []    *Section 115: Offering a False Instrument for Filing in a Public Office*

> [¶] Gruber contends there was insufficient evidence to support his convictions for violating section 115.  Specifically, Gruber argues the evidence is insufficient to show (1) the UCC-1 financing statements were instruments within the meaning of section 115, (2) the statements were false, and (3) Gruber knew the statements were false when filed.

> *Standard of Review*

> [¶] "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]'" (*People v. Bolin, supra*, 18 Cal.4th at 331, citing *People v. Redmond* (1969) 71 Cal.2d 745, 755) even if "the conviction rests primarily on circumstantial evidence" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053) that is reasonably susceptible to a different finding (*People v. Escobar* (1992) 3 Cal.4th 740, 750).
> . . .

> *Falsity and Knowledge of Falsity*

> [¶] Gruber next argues there was insufficient evidence the UCC-1s filed were false or that he knew they were false when filed.  Gruber claims the UCC-1s were not false because they "were efforts to memorialize defendant/appellant Gruber's claim against the individuals involved based upon his assertion of tort liabilities[,]" and Gruber did not know they were false because he obtained a "judgment" in a court he believed was a legitimate court and he believed he had a right to file the UCC-1s.

> [¶] A violation of section 115 "is sufficiently proven when it is shown that the accused intentionally committed the forbidden act."  (*People v. Geibel* (1949) 93 Cal.App.2d 147, 168-169.)  "The required mental state is 'knowingly.'" (*People v. Gutierrez* (1997) 52 Cal.App.4th 380, 385.)  "To act 'knowingly' means only that the actor must know of the existence of the facts which constitute the offense.

1:08cv0524

Thus, '[k]nowledge does not refer to the defendant's awareness that what he or she does is culpable or criminal in nature.  Knowledge refers to awareness of the particular facts proscribed in criminal statutes.' [Citation.]" (*People v. Honig* (1996) 48 Cal.App.4th 289, 336-337; see also *People v. Ramsey* (2000) 79 Cal.App.4th 621, 632.) "'"A requirement of knowledge is not a requirement that the act be done with any specific intent. . . . The word 'knowing' as used in a criminal statute imports only an awareness of the facts which bring the proscribed act within the terms of the statute. [Citation.]'" [Citations.]" (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 285; see also *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1438-1439; *In re Ramon A.* (1995) 40 Cal.App.4th 935, 938; *People v. Horowitz* (1945) 70 Cal.App.2d 675, 702.)

[¶] For purposes of section 115, a defendant "who does not know" that he or she has offered a false document to be filed has not committed a violation of the statute.  (See *People v. Rubalcava* (2000) 23 Cal.4th 322, 332; *People v. Taylor* (2001) 93 CalApp.4th 933, 941; *People v. Gaitan* (2001) 92 Cal.App.4th 540, 547.)  The statute does not sanction a defendant who acts "recklessly;" the defendant must act with actual knowledge of the false or forged nature of the instrument filed.  (See *People v. Stanistreet* (2002) 29 Cal.4th 497, 506; *People v. Garcia* (2001) 25 Cal.4th 744, 752-753.)  Thus, the evidence must prove Gruber knew the existence of facts that established the invalidity of the UCC-1s, i.e. that he did not have a security interest in the collateral listed or a legitimate judgment against the named debtors, and made a false statement in the UCC-1s.

[¶] Contrary to Gruber's arguments, there is sufficient evidence to support the jury's findings that the financing statements were false and Gruber knew they were false.  As explained above, the jury reasonably could conclude the financing statements were false because Gruber had no security interest in any property of the "debtors" listed as collateral and none of the "debtors" had authorized the filing of the statements.  In addition, the financing statements were false because they were not based on any legitimate judgment or debt, as they were based on judgments from a fictitious court.

[¶] The jury also reasonably could conclude Gruber knew the financing statements were false.  The jury reasonably could infer Gruber was aware that courts lawfully existed in California which would not recognize the purported judgments he obtained in the Thirteenth Judicial District, as a police officer stopped the vehicle he was driving, cited him for failing to have a valid California registration and impounded the car, which Crane's Towing refused to return to him without a release from the police department.  Since the UCC-1s were based on judgments from a fictitious court which Gruber knew was not a recognized court, the jury reasonably could find Gruber also knew the UCC-1s falsely represented that any of the debtors listed on the statements owed him a genuine debt or that he had a security interest in any of the collateral listed on the statements.

[¶] Moreover, the jury reasonably could infer Gruber did not actually believe he was entitled to the damages he claimed he was owed, as there is no evidence Gruber had even an arguable claim against any of the purported debtors or was entitled to the significant amount of damages claimed.  As the People point out, the purported debtors had a tenuous connection to any alleged wrongdoing against Gruber – Bachhofer merely towed the vehicles on orders of the police officers involved (apparently without damaging the vehicles) and impounded the vehicles, Barron and his law firm were merely Bachhofer's attorney in the lawsuit brought against Gruber and Labelle, and Luke's and Cleek's only connection to Gruber was the fact their names appeared on court documents.  Despite the lack of evidence of

13

wrongdoing against Gruber, Gruber claimed he sustained $800,000 in damages due to Bachhofer's actions, $2,000,000 and $10,000 in damages due to Barron's actions, and he had a security interest in all of the property owned by Luke and her law firm. Despite these sums, there is no evidence Gruber attempted to collect the purported debts memorialized in the financing statements other than by filing the UCC-1s; Labelle testified he never attempted to enforce the debts he claimed he was owed.

[¶] Gruber argues, citing jury instruction CALJIC No. 2.02 on circumstantial evidence, that if circumstantial evidence regarding his knowledge of the financing statement's falsity reasonably may be interpreted as showing either innocence or guilt, we should accept the interpretation pointing toward innocence. Specifically, Gruber argues that because there was direct evidence he believed he had the right to file the financing statements, the circumstantial evidence "was manifestly reconcilable with innocence" and his conviction is not supported by substantial evidence. In making this argument, Gruber ignores the rule that "[a]lthough it is the [trier of fact's], duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the [trier of fact], not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]'" [Citation.]" (*People v. Kraft, supra*, 23 Cal.4th at pp. 1053-1054.) As we have concluded that, in the context of this case, the jury reasonably could find Gruber knew the financing statements were false, his argument fails.

(Resp't Lod. No. 5 at 13-14; 19-22.)

### (a)      Gruber's knowledge of the "falsity" of the instruments

Evidence is constitutionally insufficient to support a conviction "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In deciding whether the evidence was constitutionally sufficient, this Court must look to "the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n. 16. Penal Code section 115(a) states: "[e]very person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." Pursuant to Penal Code section 7, "[t]he word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission."

A review of the record of Gruber's trial reveals that the state court's denial of Gruber's

claim was not contrary to, or an unreasonable application of, *Jackson* in light of California law.  At trial, the prosecution presented the following evidence from which the jury could reasonably conclude that Gruber knew (as defined by the California criminal statute) that the UCC-1s were false: Gruber was made aware by the May 1999 encounter with Officer Edmonds, if he had not been aware previously, that driving a vehicle in California without proper vehicle registration or driver's license was against the law.  (Resp't Lod. Nos. 10 & 11, Reporter's Transcript on Appeal (hereafter "RT"); 1 RT 14-18.)  When Officer Edmonds made the May 1999 stop, Gruber told his son in front of the officer that he (Dale Gruber) "did not have to provide . . . any identifying information." (1 RT 16, 21.)  Dale Gruber was arrested, and the car towed.  (1 RT 16.)

Gruber was stopped by police again in March 2000 because he was driving a vehicle with a homemade license plate.  (1 RT 33-38.)  At that time, Officer Dunn cited Gruber for driving with no valid driver's license, for operating an unregistered vehicle, and for possessing no proof of insurance.  (1 RT 34.)  During this encounter, Officer Dunn heard Gruber say that he already had some type of legal action against the towing company from an earlier incident.  (1 RT 36.)  Officer Dunn later received papers filed on Gruber's behalf naming Officer Dunn and the Visalia Police Department.  The papers listed sums of $250,000 and $6,000 indebtedness against Officer Dunn. (1 RT 35-38.)

In 1999, Brian Loven, insurance agent for Crane's Towing Company and its owner Randy Bachhofer, received a document entitled "Notice of Demand," purporting to demand payment of a debt in the amount of $800,000 from Crane's Towing Company.  (1 RT 40-41.)  The "Notice of Demand" was issued from the "First House of Delegates, District Court, 13th Judicial District, California, located on the south side of Tulare County Road J-30," which the trial court ruled was not a court recognized under the law of the State of California or of Tulare County.  (1 RT 28-29.)  The demand for $800,000 was "bogus," and the insurance company did not pay.  (1 RT 41.)

In February 2003, when Randy Bachhofer was trying to sell Crane's Towing Company, Gruber's co-defendant Gordon Labelle delivered papers to the escrow company handling the sale. (1 RT 47-48.)  Among the papers delivered was a UCC-1 form with Gruber's name on it, purporting to reflect that Bachhofer was indebted to Gruber in the amount of $800,000.  Gruber's

1:08cv0524

1   co-defendant Labelle specifically remembers serving the papers regarding Crane's Towing to the

2   escrow company at Gruber's request.  (2 RT 206.)  Gruber admitted to an investigator for the

3   Tulare County District Attorney's Office that he filed the $800,000 UCC-1 against Bachhofer's

4   business "because his vehicle was towed."  (1 RT 138.)

5          The indebtedness represented by the UCC-1 was false, and the filing of the papers in

6   escrow delayed Bachhofer's sale of Crane's Towing for a little over a year and "cost several

7   thousand dollars in attorney fees to let the sale resume."  (1 RT 48-49, 51, 75-77, 89-94.)

8   Bachhofer and Gruber have never entered into a contract together and have no relationship from

9   which a debt could arise.  (1 RT 49.)  When Gruber was asked by the escrow company to sign a

10  release of the lien represented by the UCC-1, he declined to do so.  (1 RT 94.)  All tolled and

11  between January 30, 2003 and November 26, 2003, six (6) UCC-1 statements were filed with the

12  California Secretary of State, a government agency, listing Gruber as secured creditor and Randy

13  Bachhofer, Richard Barron, Linda Luke, or Luke and Barron as debtor.  (1 RT 55-58, 60.)  The

14  Secretary of State has no responsibility for screening the UCC-1 filings for accuracy; if the forms

15  are filled out properly and the fee is paid, the Secretary of State's Office files them.  (1 RT 54-55.)

16  Co-defendant Labelle recalls serving papers on behalf of Gruber, like those he served pertaining to

17  Crane's Towing, "maybe three to five times."  (2 RT 227.)

18         The trial court instructed the jury regarding the requirement that Gruber *knowingly* caused

19  a false or forged document to be filed in a public office:

20         [¶] The word "knowingly" means with knowledge of the existence of the facts in
           question.  Knowledge of the unlawfulness of any act or omission is not required.  A
21         requirement of knowledge does not mean that the act must be done with any
           specific intent.
22                                                 . . .

23         [¶] . . . I will also inform you that for the purposes of violation of Penal Code
           Section 115, that is the recordation of a false or forged document, there is no
24         requirement of intent to defraud.  So it is a general intent crime.

25         [¶] Although, as I explained to you earlier, that general , that does include
           knowledge that the documents [were] false or fraudulent - - [were] false or forged.
26

27  (2 RT 337, 343.)  The trial court also instructed the jury regarding the definition and character of

28  "circumstantial evidence:"

1:08cv0524

[¶] . . . Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn.

[¶] An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.

[¶] It is not necessary that facts be proved by direct evidence. They may also be proved by circumstantial evidence. Both direct and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other.

(2 RT 329.)

Gruber argues that the circumstantial evidence presented "was reasonably consistent with the view that Mr. Gruber believed that he had the right to do what he did in terms of the UCC filings." (Petitioner's Brief at 24.) Petitioner is incorrect. Given the evidence presented and the prosecution's burden to prove only that Gruber knew he was filing false or forged documents (and not that he knew the illegality of such filing), there was ample basis upon which the jury could conclude beyond a reasonable doubt that Gruber knew the documents were false. In other words, even assuming Gruber did not know that filing the false UCC-1 and other papers as public documents was illegal, he was still properly convicted under Penal Code section 115(a). The jury reasonably could infer Gruber knew that courts lawfully existed in California which would not recognize the purported judgments he obtained in the Thirteenth Judicial District. Since the UCC-1s were based on judgments from what Gruber knew to be an illegitimate court, the jury reasonably could find Gruber also knew the UCC-1s falsely represented that the debtors listed on the statements owed him a genuine debt or that he had a security interest in any of the collateral listed on the statements.

Moreover, the jury reasonably could infer Gruber did not actually believe he was entitled to the damages he claimed he was owed because there is no evidence Gruber had even an arguable claim against any of the purported debtors or was entitled to the damages claimed. The jury could reasonably infer that Gruber knew there no basis for him to believe that Randy Bachhofer or Crane's Towing Company was indebted to him, much less for the sum of $800,000. The same inference could reasonably be drawn regarding the police officers who impounded Gruber's vehicles and the law firm that represented Bachhoffer. As Respondent points out, the purported

1:08cv0524

1   debtors had a tenuous connection at best to any alleged wrongdoing against Gruber – Bachhofer

2   merely towed the vehicles on orders of the police officers involved (apparently without damaging

3   the vehicles) and impounded the vehicles, Barron and his law firm were merely Bachhofer's

4   attorneys in the lawsuit brought against Gruber, and Luke's only connection to Gruber was the fact

5   her  name appeared on court documents.  Despite the lack of evidence of wrongdoing by the so-

6   called debtors, Gruber claimed he sustained $800,000 in damage due to Bachhofer's actions,

7   $2,000,000 and $10,000 in damage due to Barron's actions, and he had a security interest in all of

8   the property owned by Luke and her law firm.  Despite the sums allegedly due to Gruber, there is

9   no evidence Gruber attempted to collect the purported debts memorialized in the financing

10  statements other than by filing the UCC-1s, lending further support for a reasonable belief that

11  Gruber did not believe the debts to be genuine.

12       Because a rational trier of fact could have found beyond a reasonable doubt that Gruber

13  knew he was filing false or forged public documents, the state court's denial of this claim was

14  neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

15  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  Accordingly, Ground One is **DENIED**.

16                    **(b)    "Falsity" of the instruments themselves**

17       Gruber contends he could not properly be convicted of Penal Code section 115(a) because

18  there was insufficient evidence to prove that the UCC-1s were "false" or "forged."  (*See*

19  Petitioner's Brief at 29-31.)  Gruber makes the unpersuasive argument that the UCC-1s were in

20  fact what they purported to be; in other words, that the fact that Gruber did not have meritorious

21  claims of liability against the individuals named as debtors on the documents did not make the

22  documents themselves "false" or "forged."  This form-over-substance contention fails, and the

23  evidence at trial fully supported the jury's findings.  As set out in the preceding section, a jury

24  reasonably could conclude that the financing statements were false because Gruber had no security

25  interest in any property of the "debtors" listed as collateral and none of the "debtors" had

26  authorized the filing of the statements.  In addition, the financing statements were false because

27  they were not based on any legitimate judgment or debt, as they were based on judgments from a

28  fictitious court.  Gruber submitted the UCC-1s based on illegitimate debts; thus, the UCC-1s were

1   false.

2          Gruber goes on to argue that, because the UCC-1s were not legally entitled to be recorded

3   under the Uniform Commercial Code, they cannot support a conviction under Penal Code §

4   115(a).  (*See* Petitioner's Brief at 30-31.)  Gruber is again mistaken.  As the California Court of

5   Appeal noted, "[t]he test is whether a law authorizes the recording of the instrument, not whether

6   there was a legal basis for recording the instrument. . . . This requirement is met here, where the

7   [Uniform Commercial Code] authorizes the filing of UCC-1s in the Secretary of State's office."

8   (Resp't Lod. No. 5 at 14-15, citations omitted.)   The appellate court was correct, and it is clear

9   that a rational trier of fact could have found beyond a reasonable doubt that the UCC-1s were false

10  or forged documents within the meaning of Penal Code section 115(a).  *See Jackson v. Virginia*,

11  443 U.S. at 324.  Thus, the state court's denial of this claim was neither contrary to, nor an

12  unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d);

13  *Williams*, 529 U.S. at 412-13.  Accordingly, Ground Two is **DENIED**.

14                    **ii.     California state law claims (Grounds Three and Four)**

15          In Ground Three, Gruber contends that he could not constitutionally be convicted of a

16  violation of Penal Code section 115(a) since the UCC-1s submitted to the California Secretary of

17  State did not constitute "instruments" within the meaning of Penal Code section 115(a).  (Petition

18  at Ground Three; Petitioner's Brief at 31-37.)  In Ground Four, he goes on to challenge the

19  California Court of Appeal's interpretation of California law (and, specifically, the court's "novel

20  definition" of the term "instrument") as violating California precedent and constituting an "ex post

21  facto" law.  (Petition at Ground Four; Petitioner's Brief at 37-47.)  Gruber raised Ground Three in

22  his petition for review in the California Supreme Court.  (*See* Resp't Lod. No. 6.)

23          Respondent contends that Gruber failed to raise Ground Four in the California Supreme

24  Court and that, consequently, Ground Four constitutes an unexhausted claim.  *See* 28 U.S.C. §

25  2254(b)(1)(A).  Respondent is correct; Gruber did not raise Ground Four in the California

26  Supreme Court.  (*See* Resp't Lod. No. 6.)  A review of Ground Four, however, reveals that it is

27  little more than an attempt to characterize the state law claim raised in Ground Three as a "federal

28  claim" with use of the term "ex post facto."  (Petition, Ground Four; Petitioner's Brief at 37-47.)

1    Applications for writs of habeas corpus that contain unexhausted claims generally must be

2    dismissed.  *See Rose v. Lundy*, 455 U.S. 509, 522 (1982).  This Court may deny the petition on the

3    merits, however, "where it is perfectly clear that the applicant does not raise even a colorable

4    federal claim."  *See* 28 U.S.C. §2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

5    Because Ground Four does not raise even a colorable federal claim, this Court may deny the

6    Petition, rather than dismiss the Petition for containing an unexhausted claim.  *Id*.

7         The California Supreme Court denied Gruber's petition for review without reasoned

8    decision or citation of authority.  (Resp't Lod. No. 7.)  The last state court decision to address the

9    merits of the state law claim is the appellate court's September 22, 2006 opinion denying the

10   claim.  (Resp't Lod. No. 5).  That court thoroughly considered whether the UCC-1s submitted to

11   the California Secretary of State constitute "instruments" within the meaning of Penal Code

12   section 115(a), and it found that they do.  (*See* Resp't Lod. No. 5 at 14-19.)  The appellate court's

13   thoughtful analysis and interpretation of Penal Code section 115(a) should not be second-guessed

14   by this Court on collateral review.

15        Generally, "[a] federal court may not issue the writ [of habeas corpus] on the basis of a

16   perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Only errors of federal law

17   can support federal intervention in state court proceedings, and only to correct such errors.

18   *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989) (stating that federal courts are not

19   concerned with errors of state law unless they rise to the level of a constitutional violation).

20   Additionally, federal habeas courts are bound by the state's interpretation of its own laws.

21   *Wainwright v. Goode*, 464 U.S. at 78, 894 (1983)*; Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991);

22   *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003) (holding that federal courts may not re-

23   examine state court determinations on state law issues).  Federal courts are bound by a state court's

24   construction of its own penal statutes, and must defer to that interpretation, unless it is "untenable

25   or amounts to a subterfuge to avoid federal review of a constitutional violation."  *Aponte v. Gomez,*

26   993 F.2d 705, 707 (9th Cir. 1993).  Petitioner has provided no authority to indicate that this case

27   does not fall within that general rule.

28        The issue of whether the UCC-1s were properly considered "instruments" under California

law  was a legal question for the state courts.  The California appellate court found that the UCC-1s were "instruments" within the meaning of Penal Code section 115(a).  This Court will not second-guess California's interpretation of its own laws regarding the meaning of the term "instrument" in its own state Penal Code.  Gruber's argument raises no issue justifying federal habeas relief because this Court must defer to and is bound by California's interpretation of its own laws.  *Himes*, 336 F.3d at 852.  Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  Accordingly, claims Three and Four are **DENIED.**

**IV.     CONCLUSION**

For all the foregoing reasons, the Petition is **DENIED WITH PREJUDICE**.

**IT IS SO ORDERED.**

DATED:  September 21, 2009

_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge

1:08cv0524